Part 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

## MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS
## PURSUANT TO 28 U.S.C. § 1915

JEANNE HUBER- HAPPY

~~Jack Nelson Happy~~
_____
Plaintiff(s),

v.

JACK NELSON HAPPY

~~Jeanne Huber   Happy~~
_____
Defendant(s).

: 05cv 1096 (JCH)

3.05mc 218 (JGM)

Case No. _____

Ⓙ

I request leave to commence this civil action without prepayment of fees, costs,

or security therefor pursuant to 28 U.S.C. § 1915.  In support of my request, I submit

the attached financial affidavit and state that:

(1)   I am unable to pay such fees, costs, or give security therefor.
(2)   I am entitled to commence this action against the defendant(s).
(3)   I request that the court direct the United States Marshal's Service to serve
process.

_____
Original Signature

Jeanne Huber-Happy
_____
Name (print or type)

7 Gray Lane
_____
Street Address

Westport, CT                    06880
_____
City          State          Zip Code

(203-255-1324
_____
Telephone Number

Rev. 2/3/05

I hereby certify that the foregoing
is a true copy of the original document
on file. Date: 9/22/05

KEVIN F. ROWE
Clerk

Deputy Clerk

Page 1

15

U.S. DISTRICT COURT

DISTRICT OF CONNECTICUT

JEANNE HUBER-HAPPY,
PLAINTIFF,

V.

CIVIL ACTION NO.
3:05-CV-1096 (JCH)

JACK NELSON HAPPY, ET AL.
DEFENDANTS.

JANUARY 31, 2006
Revised – April 27, 2006

## AFFIDAVIT OF WILLIAM JOSEPH HUBER IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, William J. Huber, having been sworn, state under oath:

1. I am a resident of Westport, Connecticut and have resided there with my wife, Georgene, since 1977. Our daughter, Jeanne Huber-Happy, and her son Julian Happy have resided with us for over two years in Westport, Connecticut.

2. Since May 31, 1993, I have been retired from the position of Vice President – Engineering at the Hamilton Standard Division of United Technologies Corporation, with headquarters in Hartford, Connecticut. In that capacity, I was responsible for a staff of approximately two thousand employees engaged in the research and development of a broad range of aerospace products for the Department of Defense, NASA and Commercial Aircraft Manufacturers and Airlines. I am now 77 years of age and hearing impaired.

1

*16*

3.  Since August 2001, I have been assisting my daughter in Chancery No.: 34394 in the Circuit Court of the City of Newport News, Virginia and more recently in Case #: 3:05-cv-01096-JCH in the U.S. District Court in New Haven and Bridgeport, Connecticut, with appeals pending in the U.S. Court of Appeals for the Second Circuit and the US Supreme Court.  In that capacity, I have been present during most of the Court Hearings in Virginia.  I have witnessed: my daughter repeatedly isolated in court hearings; testimony denied; and evidence suppressed.  My right to testify on behalf of my daughter was continually objected to by Jack Nelson Happy's attorneys and sustained by the Courts.  Supporting documentation of the more egregious examples is available in the Transcripts of Proceedings for the Court Hearing on January 27, 2005 at which time I was sequestered for the entire day and never allowed to testify.  Subsequent hearings were scheduled in Virginia without her agreement, and also after removal of the case to the U.S. District Court for the District of Connecticut.

4.  My daughter is now accused of "frivolous appeals" when she is simply trying to realize some justice against a formidable array of highly skilled attorneys.  Some history is in order to understand the injustice that currently exists.  When Jeanne Huber-Happy married Jack Nelson Happy she was: 37 years old; a successful corporate attorney; the owner of a lovely home in Newport News; and had no debt except for the affordable mortgage.  Mr. Happy moved into my daughter's home since he had no assets and was plagued by financial and legal debt resulting from an FDIC banking investigation and unpaid obligations to his prior two wives.  My daughter is now unemployed; 52 years old; without assets; and encumbered by debt resulting from the unjust court actions.

17

5. In the last several weeks Jeanne Huber-Happy was informed of one more injustices in which her son, Julian Happy, is the potential victim. Polly Rankin, Julian's paternal grandmother, died on February 3, 2006 and left a will naming her adult grand-daughter and a step son as the recipients of her personal property. The only mention of Julian is as one of two surviving grandsons. The circumstances surrounding the notification of Mrs. Rankin's death to my daughter and Julian are troubling. First, neither my daughter nor Julian were notified of Polly Rankin's passing. It was only when my wife, Georgene, received a returned letter marked "deceased" that we learned of the unfortunate event. In conversation on April 22nd, Julian asked his father why he had not previously been told of his grandmother's passing. Unbelievably, the reply was that he, Mr. Happy, "did not consider it important".   Second, the timing of this omission is troubling in that a court hearing is scheduled on the estate on May 9, 2006 which my daughter learned through an independent inquiry. The lack of proper disclosure clearly could have prevented any participation by Julian and my daughter at the hearing. It is hard to imagine why Mr. Happy would be so callous as to consider the death of his mother as unimportant or that a grandchild would not want to be informed or pay his last respects. For Julian to now be told that he has not been mentioned in the will, except as a family member, is very important to a child who was depending upon some distribution for future college and professional schooling. How could a father be so inconsiderate of his son's concerns to such a degree? It is only understandable if one considers this event in the context of his troubling relationships with my daughter, his mother, his children and previous wives.

18

6. Mr. Happy's recent actions leading to the finding of "frivolous appeals" and compensation for expenses of $10, 903.21 are all part of a disturbing pattern to destroy my daughter financially and professionally. As mentioned above, Mr. Happy's past relationships with the FDIC, his mother and his prior wives are strikingly similar as available court documents indicate. In Mr. Happy's APPLICATION FOR WRIT OF EXECUTION, he fails to note that arrearages due to my daughter have existed since as early as 2002 in the amount of $12,490.00. Further, spousal and child monthly support payments have been deficient by $558.00 during 2006. If this continues, the arrearage will increase by the said $558.00 each month beginning in May 2006.

7. Perhaps the most important issue is that the frivolous appeals charge relate to activities that are considered to fall within the province of RICO and for which all requests for a substantive hearing have been denied. Mr. Happy has repeatedly used his position in Dr. Pat Robertson's many business activities to influence matters that are relevant to this entire divorce proceeding. The most notable example is the preparation of the "Settlement Agreement" regarding Mr. Happy's separation from said business activities. All proceeds from the "Agreement" were ruled separate property belonging to Mr. Happy although his employment with Dr. Robertson's enterprises was predominantly during the marital period. Jeanne Huber-Happy was excluded from participation in the negotiation of the "Agreement" in direct violation of a court order. As discussed below, all testimony (including a deposition with Dr. Robertson) regarding this "Agreement" was denied by the court. Of special significance was the existence of a threat from Mr. Happy to disclose details of Dr. Robertson's business dealings to the media unless a suitable settlement was reached. Similarly, spousal and child support payments were

4

delayed by the action of Mr. Happy's subsequent employer, Mooney Aerospace, at a time of great financial need by my daughter. Again testimony on this matter was suppressed by the courts. These are but a few examples of potential RICO considerations that certainly would appear to justify a court hearing. They do not appear to the writer, with many years of executive experience in the high technology industry, to be in any sense frivolous. The following paragraphs provide certain relative details in support of the above statements.

8. Despite repeated attempts, I was only permitted to testify on one occasion and that was at the Court Hearing on March 28, 2002. At that time my testimony was limited to a five minute discussion of the significant financial assistance that my wife and I provided to the Happy family during the marriage and after the marital separation.

9. At a December 18, 2002, Deposition of Dr. M. G. Robertson, who employed Jack Nelson Happy, I was not allowed to accompany my daughter in the actual Deposition. It was represented by Mr. Isakoff, attorney to Dr. Robertson, that Dr. Robertson would be "uncomfortable" testifying in my presence due to a prior business association. My daughter, who had no personal litigation experience before this case, was left alone during the Deposition opposed by four highly experienced attorneys: Dr. Robertson and his attorney, Louis Isakoff; and Jack Nelson Happy, and his then attorney Collen Killilea. All present agreed that the Deposition was allowable in subsequent court hearings. (Page 5 of the Videotaped and Transcribed Deposition Upon Oral Examination of M.G, Robertson – December 18, 2002) Despite this agreement, admissibility of the Deposition was objected to by Mr. Murov, Plaintiff's Counsel, and sustained by Judge Walter J. Ford in a hearing on June 7, 8 and 9, 2005. As discussed below, this Deposition

by Dr. Robertson was a crucial part of Jeanne Huber-Happy's case and in my view, is the most significant example of the suppression of evidence and obstruction of justice.

10. Retired Judge Ford was appointed while Leroy Hassell was Virginia Supreme Court Chief Justice, and after all the Judges of the Seventh Judicial Circuit recused themselves in response to my daughter's concerns that Jack Nelson Happy's contacts as an attorney and former Dean of Regent Law School would prevent her from receiving a fair trial. The unprecedented recusal was an affirmation by the Judges of the Circuit Court that my daughter's concerns were well founded. (The applicable ORDER was from Chief Judge H. Vincent Conway, Jr. dated August 20, 2003.) Why then were her concerns not heeded by the Virginia Supreme Court and Justice Hassel who had been employed by Mr. Happy when he was the Dean of Dr. Robertson's Regent Law School in Virginia Beach? My daughter's concerns regarding the likelihood of receiving a fair trial appear well justified in light of the suppression of Dr. Robertson's Deposition and other Court actions as described below. This concern, plus the difficulty of travel to Newport News from Connecticut for court hearings, research and depositions; and family responsibilities were all factors in determining that a change in venue was essential. The first step was to seek a Motion to Dismiss based on forum non conveniens.

11. A Court Hearing was held on January 27, 2005 with Judge Ford presiding to rule on the Motion to Dismiss and other issues. I was a designated witness on several issues including the Motion to Dismiss. At the request of Kenneth Murov, I was sequestered. In a request to the Court regarding my testimony, the Defendant asked – "May he ... on the Motion to Dismiss, may I call him to testify?" The Court's reply, "No ma'am. I don't ... that's a legal issue. I don't need testimony from a lay witness to make

6

**21**

a determination whether this case should be dismissed." He then ruled to deny the Motion to Dismiss. In doing so, Judge Ford dismissed all consideration of my daughter's concerns for a fair trial and the difficulty that she faced in representing herself, without access to extensive marital funds other than support, in a setting 400 miles from home and her only child. The Court also continued the pattern of denying my right to testify.

12. This pattern continued throughout the Hearing on January 27, 2005. I was sequestered for the entire hearing although many financial and other issues were discussed upon which I had undertaken the research and was well prepared to discuss. When my testimony was requested by my daughter, Mr. Murov objected and the Court sustained the objection. My daughter was isolated, opposed by an experienced litigator, his legal assistant and coached by a law school dean. The Court's rulings were consistently contrary to my daughter's interest. I was sequestered and unavailable to provide testimony in support of my daughter's position and legal rights. The outcome was predictable. The written transcripts for all of the Newport News Circuit Court hearings except the first hearing in December, 2001, and the trial in June, 2005, were sent by my daughter to the Newport News Circuit court for incorporation in the record and are available by the U.S. District Court for review of the above statements. Due to the prohibitive cost of purchasing additional copies of the transcripts and videotapes by my daughter, an IFP litigant, the U.S. District Court must obtain the complete trial court record, transcripts and all videotapes, directly from the Newport News Circuit Court and transfer the entire record to the U.S. District Court for the District of Connecticut for review in this case. The transcript of the June 7, 8, and 9, 2005 trial has been purchased by Jack Nelson Happy, but Jeanne Huber-Happy was not provided with funds to also

7

22

purchase it. In fairness, the U.S. District Court should provide funds to obtain a copy of this transcript for the record. Despite my daughter's request for a court reporter for the first hearing in December, 2001, a court reporter was not provided.

13. In the next Hearing on June 7, 8, and 9, 2005, mentioned above, Judge Ford was again presiding and my daughter and I were alone opposed by Jack Nelson Happy, his counsel and legal assistant. Numerous objections and motions were filed protesting the violation of my daughter's legal rights and my legal rights in the handling of this case, but they were disregarded. As a result, we were unsure on how to proceed regarding my testifying especially in view of the history in the Hearing on January 27, 2005 when I was wrongly sequestered for the entire proceeding. I did not want to leave my daughter alone for three days in the same environment that existed on January 27, 2005. I elected to remain in the courtroom and forego testifying since I believed that my daughter's evidence was strong – especially with information contained in Dr. Robertson's Deposition.

14. Mr. Murov, Jack Nelson Happy's attorney, objected to the admissibility of Dr. Robertson's Deposition in video form despite the prior agreement by all legal representatives at the time of the Deposition. The Court incorrectly sustained the objection since the objection was based only upon a partial reading of the -RULES OF THE SUPREME COURT OF VIRGINIA – Rule 4.7 (Use of Depositions in Court Proceedings). My daughter then requested that the written Deposition be admitted. Again this was denied. She then requested approval of a Motion for Continuance to permit an existing subpoena for Dr. Robertson's testimony to be used in a future Court Hearing. This again was denied.

15. When it came time for cross examination of Jack Nelson Happy and his second ex-wife, Mary Mathews, my daughter's evidence was again thwarted by Mr. Murov and the Court. In both cases, the cross examinations were wrongfully and aggressively objected to by Mr. Murov and then abruptly terminated by the Court. The legal basis for such action was not provided.

16. The termination of testimony prevented cross-examination regarding Jack Nelson Happy's evidence and exhibits, much of which was introduced without proper notice and foundation. One example, involved testimony regarding significant debts incurred by Jack Nelson Happy, and/or Mary Matthews, that were claimed to be marital debt. The Defendant did not have prior and substantive knowledge of many of these debts and was denied the opportunity for in depth cross examination and subsequent research. One debt was a charge for the lease of a family automobile that had been repossessed and for which the leasing company expressed a willingness to negotiate. As a result of the termination of the cross examination, Judge Ford approved the marital classification of the debt as submitted by Jack Nelson Happy's counsel without change. Contrary to good business practice, no requirement was imposed by the Court for a final accounting of actual payments made by Mr. Happy. Paradoxically, none of Jeanne Huber-Happy's debts were considered marital and they were all dismissed without discussion. These debts included extensive credit card debt incurred for professional and legal services to counter false charges in Jack Nelson Happy's initial filing for "Fault" that was later changed to "No Fault" and the debt for financial assistance provided by my wife and myself during and after the marital period. One debt was for funds provided to Jack Nelson Happy by the writer for business purposes (a computer lease) and for which

9

24

a written contract exists. The contrast in the treatment of debt by the Court between Jack Nelson Happy and Jeanne Huber-Happy is a clear indication that my daughter's concerns for a fair trial were well justified. This unjust treatment is at the core of my daughter's determination to continue the struggle until a just decision is reached.

17.  In summary, due process was denied repeatedly since 2001 through suppression of evidence and denial of testimony. The above facts are all available for review in the Transcripts of Proceedings for all Court Hearings with the exception of the first Hearing on December 11, 2001. The above contains only the more egregious events. A full review is beyond the ability of the writer to adequately describe but involves what appears to be a concerted attempt to reach a settlement that is unjust to my daughter, in response to threats such as those that are described in the Deposition of Dr. Robertson. As such, consideration should be given to a RICO investigation since it is possible that several organizations (Mooney Aerospace Group, Ltd.; CENCO Parties; and others) with national and international commerce were involved in questionable legal activity.

18.  One additional point is, as mentioned above, the writer has a significant hearing loss. Despite repeated requests, the court rooms were never adequately provided with assisted listening systems, as required by Federal and state law, the FDA (Americans with Disabilities Act – Title II: State and Local Government Activities), to permit my full participation in the proceedings. The result was that I was denied my legal right to participate to the extent permitted by law in this case.

25

William Joseph Huber
Dated – April 27, 2006

State of Connecticut
County of Fairfield

Signed and sworn to before me on April 27, 2006

Notary Public

Leslie A. Marchese
Notary Public
State of Connecticut
My Commission Expires
October 31. 2009

My commission expires on _____

11

26

# SUPPLEMENT TO AFFIDAVIT OF WILLIAM JOSEPH HUBER
## DATED APRIL 27, 2006

LIST OF ATTACHMENTS

1. A PATTERN OF RACKETEERING ACTIVITY

2. DR. ROBERTSON'S DEPOSITION – DECEMBER 18, 2002

3. THE PURCHASE AND SALE OF 701 CAPTAIN JOHN SMITH ROAD, NEWPORT NEWS, VIRGINIA

4. THE "EQUITABLE DISTRIBUTION" OF PLAINTIFF'S DEBT

5. SUMMARY OF LOANS TO THE HAPPY FAMILY FROM GEORGENE AND WILLIAM J. HUBER

6. J. NELSON HAPPY'S PREMARITAL ASSETS AND DEBTS

# A PATTERN OF RACKETEERING ACTIVITY

1. A "pattern of racketeering activity" existed that was practiced repeatedly by Nelson Happy and resulted in the loss of all Jeanne Huber-Happy's assets and accumulation of over $100,000 in debt plus the apparent loss by her retired parents of over $250,000 ($340,000 with interest) in loans provided to the Happy family in the marital period. This racketeering behavior directly contributed to Happy's failure to meet his business goals as Chief Executive Officer at the Cenco Refining Company.

2. The failure at CENCO was likely the result of duplicity and abdication of responsibility as a "highly compensated" CEO. In the deposition of Dr. Robertson regarding Mr. Happy's compensation he stated that, "I authorized $250,000, but before it was finished, he was paying himself, I think, either 315- or 325- plus expenses, and I have never gotten a full accounting of what he was doing because he was authorizing raises for himself".

3. In addition to his full time responsibilities at CENCO he was concurrently employed during 2001 and possibly earlier with Capstone Turbine Corporation and as an independent legal and management consultant. As an indication of his abdication and inattention to his CEO responsibilities during 2001, he had gross revenue from: Capstone Turbine of $617,000; $42,500 from independent legal consulting; and retroactive consulting income from Mooney Aerospace of approximately $18,000. His reported adjusted gross income was $410,076 for 2001. (Notwithstanding the multiple sources of this significant income, he falsely testified on December 11, 2001 that he was unemployed. The Court accepted this assertion and set an imputed income of $150,000 as a basis for establishing the amount of spousal and child support. It was subsequently learned that he received retroactive income beginning on November 15, 2001 as a consultant from A.A.S.I./Mooney Aerospace.)

4. Nelson Happy had been working in many of Dr. Robertson's domestic and international enterprises beginning in 1992 at Regent School of Law. He became knowledgeable of the most intimate details of most of these business and academic activities and used this knowledge as a lever to continue to receive compensation from CENCO long after it was recognized that it was unlikely to be successful.

5. Finally in November 2001, Dr. Robertson gave up all hope of success and began the process of stopping the losses. The first step was to terminate Happy. Dr. Robertson found that the termination would be a difficult process since certain promises had been made to Mr. Happy of significant financial gain upon achieving the goals at CENCO. J. Nelson Happy wanted compensation despite the failure at CENCO and in Dr. Robertson's own words, "Well the threat was made that not only was he going to bring a lawsuit against us, but he was going to a reporter and, quote, 'tell his side of the story'

28

regarding whatever transactions ... primarily CENCO and try to embarrass me in the press" if a suitable separation agreement could not be reached.

6. Problems continued to escalate and Dr. Robertson wanted a prompt resolution of his relationship with J. Nelson Happy. This resulted in a SETTLEMENT AGREEMENT AND GENERAL RELEASE that was negotiated without the participation of Jeanne Huber-Happy and was structured to appear to be a separate award to Nelson Happy notwithstanding the fact that Happy's ten year employment with Dr. Robertson's organization was exclusively during the marital period and that this was in fact marital property. Despite the extreme relevance of Dr. Robertson's deposition, it was not allowed as testimony in the Court Hearing in June 2005. What possible reason can be given for such an unjust Court ruling other than unlawful conduct?

7. The racketeering pattern then took on the additional predicate act of cover-up requiring the participation of the law firm of Jones Blechman Woltz & Kelly. An example was the release of a copy of the SETTLEMENT AGREEMENT to Jeanne Huber-Happy on May 2, 2002 by Happy's attorney after the AGREEMENT had been legally executed thereby preventing the participation by Huber in the process as required by Court order.

8. Happy then appeared to involve his new employer, A.A.S.I./Mooney Aerospace, in the racketeering activity by, as stated above, obtaining deferred compensation for the period beginning November 15, 2001 in order to permit claiming that he was unemployed in a Court hearing in December 2001. In addition, arrearages in support payments developed during 2002 that were later claimed to be the fault of administrative personnel at A.A.S.I./Mooney Aerospace. At this time, Happy was either the Executive Vice President or President of the firm (subsequently the CEO). It is unlikely that administrative personnel would defer payment to a spouse without the approval of such a senior executive.

9. The full extent of participation by Dr. Robertson's numerous organizations; Jones Blechman Woltz & Kelly; and A.A.S.I. requires additional discovery and testimony as does the strange recusal of all the Newport News, Virginia Circuit Court Judges, the appointment of a retired Judge and the suppression of evidence and testimony in the numerous Court hearings and especially during 2005. Further, Happy has continued to the present his manipulations, delays and defaults on child and spousal support.



# DR ROBERTSON'S DEPOSITION
## DECEMBER 18, 2002

1. A two hour deposition was held in Virginia Beach, VA in keeping with Dr. Robertson's schedule availability.

2. The attendees included:
   a. Dr. Robertson and his attorney Louis Isakoff
   b. The Plaintiff, J. Nelson Happy and his attorney Colleen Killilea
   c. The Defendant, Jeanne Huber-Happy

3. In introductory remarks, all participants agreed to the admissibility of the deposition in future Court hearings. Since Dr. Robertson and J. Nelson Happy are attorneys, five attorneys agreed to the question of admissibility in future Court hearings.

4. In preparing for the Court hearing on June 7 to 9, 2005, the Defendant planned to use the deposition as a central body of evidence relating to the equitable distribution of proceeds from the CENCO SETTLEMENT AGREEMENT AND GENERAL RELEASE – dated April 19, 2002.

5. When the Defendant requested equipment for the viewing of video recordings of the deposition, the Plaintiff's counsel objected. When Judge Ford sustained the objection, the Defendant then proceeded with the printed copy of the deposition. This also was objected to by Plaintiff's counsel and sustained by Judge Ford. The reason given by the Plaintiff's counsel was that the deposition was not in compliance with Rule 4:7.(4) of the RULES OF THE SUPREME CT. OF VA. The Defendant objected to the inadmissibility consistent with a more complete reading of Rule 4:7.(4) and the agreement reached during the deposition as described above.

6. When the Defendant was over-ruled, she introduced a motion for continuance to permit the enforcement of an existing subpoena of Dr. Robertson. This also was denied by Judge Ford.

7. Despite this lack of testimony, Judge Ford ruled on June 9, 2005 in favor of the Plaintiff regarding the non-marital status of the distribution of assets resulting from the CENCO SETTLEMENT AGREEMENT AND GENERAL RELEASE.

8. The above conduct by the VA Court, the Plaintiff's counsel and others is one example of the repeated suppression of evidence practiced in this case and a suitable subject for a Federal RICO inquiry.

# THE PURCHASE AND SALE OF
# 701 CAPTAIN JOHN SMITH ROAD,
# NEWPORT NEWS, VA

1.  701 Captain John Smith Road was purchased on August 16, 1995 for $490,000 to satisfy Happy's perceived business and social needs. Huber had no desire to sell the home that she had solely purchased, without the assistance of Happy, and more than satisfied the needs of her small family. Happy had assured Huber that her equity would be secure and to have confidence in his earning capacity.

2.  In order to purchase the home at 701 Captain John Smith Road, Huber's home at 201 Parkway Drive was sold for $230,570 and the net funds of $76,014 used as the main asset.

3.  A mortgage was obtained for $416,500.00 with an additional $83,780 required for the closure provided from Huber's sale of 201 Parkway Drive plus $9,000 assistance from William J and Georgene Huber. No funds were provided by Happy for the purchase.

4.  Happy had extensive personal debt which he rotated through about 40 credit cards. He placed $143,020 of this personal debt as a second mortgage on 701 Captain John Smith Road (Magnolia Manor) arguing that now the interest was deductible. In fact, Happy had been planning a divorce for a long time and wanted to create a balance sheet and financial picture of poverty and debt. This was not supported by the facts or by the assets. After the separation in November, 2000 he suddenly had multiple houses and cars, for example, he bought a house in Kansas on Barker Street for his ex-wife Mary Matthews, a $500,000 mortgage in California with Washington Mutual Bank showed up on a credit check, and Happy is concealing a 100 acre cattle ranch in the San Antonio area of Texas, called R&R Ranch which he represented on the balance sheet to Judge Ford as a small investment during a review of assets. Insurance records showed a Rolls Royce and a Mercedes, in addition to a Honda, and a truck. Having left a balance sheet of debt for Huber, Happy's program was for a financial collapse and bankruptcy for Huber, and to force Julian Happy to live with him as a hostage.

5.  Huber, with the help of her parents, was able to negotiate with the financial institutions to postpone foreclosure until the home could be sold in June 2002.

6.  Without any financial or physical help from Happy, Huber then located another residence and arranged for the movement and storage of all the furnishings from the 7500 square foot house. At Happy's request, Judge Curran froze Huber's separate property, Magnolia Manor sale proceeds, which by law should not have been subject to the jurisdiction of the court. The proceeds from the sale of the house of $76,158 were frozen pending the final distribution of all assets. No allowance was provided for the repayment

to Huber's parents for mortgage, moving and other financial payments that were required to prevent foreclosure and to help Huber during this difficult time by returning her assets from the sale of her home.

7. Judge Ford then distributed $62,624 to Happy from Huber's separate property of the $75,158 proceeds, for the payment of Happy's alleged "marital" debts as discussed under the title of "The Equitable Distribution of Plaintiff's Debt".  By freezing the proceeds, Happy created a possible tax liability so that Huber could reinvest them in a residence without tax liability.  Happy then defaulted on an agreement to pay the family taxes thus targeting Huber for additional IRS problems.  This was followed by an attempt to disbar her so that she could not work to pay anything while Happy defaulted on support payments.

32

# THE "EQUITABLE DISTRIBUTION" OF PLAINTIFF'S DEBT

1. Happy claimed, and the Court agreed, that most of his significant debt was "marital" and therefore payment was a responsibility to be shared by Huber. However, Huber was not knowingly a participant in the genesis of much of this debt and should have been held harmless in such instances. What also was not disclosed was the selective payment of debt by Happy using marital funds in prior years concentrating upon those debts that were clearly his and not marital. Payment of debt that was considered to be marital received only the minimum or token payment or were allowed to actually increase. This improper management of debt using marital funds by Happy was clearly improper and put an unfair debt burden on Huber as would have been disclosed if cross examination and testimony by Huber had been allowed.

2. Paradoxically, the Court denied testimony of Huber's significant debt and loans provided by her parents during the marital years. It was left as the sole responsibility of Huber to resolve. Why were all debts not treated equally? The lack of full testimony and inquiry into the genesis of all outstanding debt demands judicial review. The following discussion relates only to the debts classified as marital by Happy.

3. In a Motion For Relief From Temporary Injunction filed on July 22, 2002, the Happy's counsel stated in Paragraph 4 that – "Happy retained a firm, Financial Solutions Inc., to attempt to settle with the creditors and that firm has obtained one settlement, with American Express, at a substantial discount. Happy believes that all of the scheduled obligations can be settled for about two-thirds of their face amounts."

4. Notwithstanding this proven importance of negotiation, the Plaintiff's counsel claimed that Huber's obligations was $62,624.66 in the settlement of Happy's "marital" debts. Happy's counsel then proposed, and the Court acquiesced to, the withholding of this $62,624.66 from the separate $76,158.45 proceeds from the sale of Huber's home to be used by Happy, at his discretion, for the settlement of these debts. In so doing, the Court dismissed all safeguards to protect the interests of Huber regarding debt reductions achieved through negotiation.

4. As an example, in correspondence, dated June 2, 2004, from Cavalry, a collection agency, it was stated that the balance due on Huber's suburban was $18,500 and "We realize that these are difficult economic times, and are willing to work with you to resolve this matter". Despite this willingness to negotiate, and the proven success in negotiation, Happy used the full value of $18,500 in determining the Huber's obligation. Since the suburban was repossessed in early 2002 when the amount actually due was $3,625, negotiation should have resulted in a very significant reduction in the debt. In addition, the lease was not marital since it was solely in Happy's name.

33

Happy's use of the $18,500 as a basis for the seizing of Huber's assets, is a clear indication of fraud and the lack of integrity regarding Happy's submitted schedule of debt.

5. The simple question is, did Happy secretly plan to negotiate a one third, or higher, reduction in the other remaining credit card debt and retain the savings for his personal use?

6. Further, Happy claimed that he had used marital funds totaling $17,022 from Scudder, ACLJ 401k and Cenco 401k receipts for payments to the MBNA account 1917. Discovery is missing to determine if payments were made to MBNA at the time and amount of the receipts from these marital assets. They were not used to reduce the debt of $36,315 at separation as claimed by Happy in the debt schedule. If they had been correctly applied, the "marital debt" would have been reduced to $19,293. Again, this appears to be an obvious fraudulent attempt to misuse marital assets and to incorrectly assess Huber for marital debt. Further, this debt is, and has been, in the name of Jack N. Happy at addresses in Princeton, NJ; Newport Beach, CA; and Lawrence, KS. Huber has had no visibility of, and participation in, the accumulation of this debt.

7. That the above fraudulent behavior was allowed by the Court is especially troubling and is one of many reasons why the RICO statutes should be applied. The Court terminated cross examination of Happy and his current companion, Mary Mathews, and also limited the testimony of Huber that would have allowed the more complete examination of these issues.

8. An independent audit and accounting of the actual payments that were made on these debts by Happy is required. Why has the Court not required such a final accounting?

9. While the above relates only to debt, testimony relating to the lack of discovery of Happy's assets and income tax statements was never allowed by the Court since applicable testimony and cross examination was terminated. How could the Court allow such an injustice?

34

# SUMMARY OF
## LOANS TO THE HAPPY FAMILY
## FROM GEORGENE AND WILLIAM J. HUBER

The total of all loans provided by Huber's parents, Georgene and William Huber, from 1991 to 2005 is $255,196. This sum does not include normal gifts given for special reasons such as holidays and birthdays. When consideration is given for interest on these loans, the total becomes $339,480 for an interest rate of six percent. Most of the loans were deposited in the joint family checking account.

The following is a summary of the specific reasons for the more significant loans from the Huber's parents:

1. The loans in 1991 for $9,200 were for the purpose of providing funds for the improvement and renovation of the Huber's home at 201 Parkway Drive which was jointly occupied by Happy.

2. Miscellaneous loans of $6,000 during 1992, 1993 and 1994 were also for the above stated reason. In addition, a significant loan, dated 15 July 1993 was given to Happy to provide computer equipment for the Tower Law firm. This loan was in the form of a legal lease for the payment of sixty monthly payments of $767.76. Only one payment of $1,100 was received.

3. The loans from 1995 to 2001 of $37,592 were for the purpose of helping with expenses for the maintenance and improvement of 701 Captain John Smith Road as well as mortgage and credit card payments. These loans were necessary due to the extraordinary expenses resulting from the purchase of such the over 7500 square foot home that was three times as large as the home at 201 Parkway Drive.

4. In August of 2001, Happy initiated divorce action for cause necessitating the retention of counsel and the services of a clinical psychologist. Initially, these expenses were paid through the use of credit cards by the Defendant until limits were reached.

5. In November 2001, Happy walked away from all responsibility for the payment of the huge expenses for 701 Captain John Smith Road including the two mortgages and the normal operating and maintenance expenses. Huber, with spousal and child support payments of approximately one third of the funds required to pay these expenses and with all credit exhausted, had no choice but to request help from her parents or walk away from all responsibility as Happy had done. Fortunately, Huber was able to negotiate with the financial institutions to provide some relief from foreclosure until the home was sold in June 2002.

5. The Court ordered all resources from the sale of the home to be frozen and Huber, without resources, was faced with finding a temporary home for herself, her young nine year old son. The burden of moving the contents of the large home also fell upon Huber

35

with no financial, emotional or physical help provided or offered by the Happy.  The stress on Huber was intense with the clear purpose of destroying Huber as Happy had threatened.

6.  During the period 2002 to 2006, Huber's expenses were far beyond her ability to pay including legal and professional service expenses; moving costs; credit cards; and mortgage payments to avoid foreclosure; and normal living expenses.  Huber's parents provided necessary loans to maintain solvency and avoid the plight of Happy's second wife who was driven into bankruptcy.

Testimony by the Huber's father regarding these debts was repeatedly denied and the Court disregarded the debts in the final decision on asset distribution.  The stark difference in the treatment of Happy's and Huber's debts requires an independent judicial review and inclusion in a RICO inquiry.

These loans were made in good faith by Huber's parents and in one case a written contract exists that has been ignored.  Happy must be required to pay these debts immediately with interest.  This is a clear case of grand larceny and cannot be allowed by our judicial system.

# J. NELSON HAPPY'S PREMARITAL ASSETS AND DEBTS

1. On the marital date, January 11, 1992, Jeanne Huber-Happy was 37 and a successful corporate attorney. She had purchased an attractive four bedroom home at 201 Parkway Drive, Newport News, VA for $220,353 on February 4, 1991 and had no debt other than an affordable mortgage of $163,073 and a monthly payment of $1,768. The Plaintiff moved into Huber's home since he had no assets and was encumbered by unpaid bills and numerous law suits with his prior two spouses and the Federal Deposit Insurance Corporation. Now the Defendant is 52, unemployed, with considerable debt and living with her 13 year old son with her parents in Connecticut.

2. These suits against the Plaintiff were all settled during the marital period at considerable expense and resulting debt as described below. For some reason, the Court did not allow discussion of the Plaintiff's premarital debt and expense of debt service nor the Jeanne Huber-Happy's's premarital assets in determining equitable distribution.

3. The suit with his first spouse, Elizabeth Happy, was initially settled on December 2, 1982 but the Plaintiff (J. Nelson Happy) failed and refused to make certain payments that resulted in a Motion for Judgment on August 19, 1994. The suit was settled on February 6, 1995 with the payment of $65,000 from marital funds by Mr. Happy.

4. The hearing with Happy's second wife, Mary Jane Mathews Happy, was settled on August 8, 1991. On May 16, 1994, a Judgment of Contempt was entered against Respondent Jack Nelson Happy and ordered committed to the custody of the County Jail of Cole County, Missouri for confinement until such time as he has purged himself of contempt by payment of $30,339.63. A final Judgment was entered on January 13, 2000 dismissing the Order of Contempt and the garnishment of wages for full satisfaction of judgment. This amount was also paid from marital funds.

5. Judgments were entered on January 3 and 19, 1989 in the Supreme Court of the State of New York in favor of the Federal Deposit Insurance Corporation against J. Nelson Happy for the sums of $565,226 and $1,494,062. On December 21, 1993 full satisfaction of judgment was entered for the January 3rd judgment and partial satisfaction was entered for the January 19th judgment. Full satisfaction of the January 19, 1989 judgment was entered on January 18, 1995. More information is needed through discovery as to the actual payment of funds to settle these suits.

6. While the entire cost of these settlements including legal and debt service costs is not known and discovery required, it is believed that these costs and other premarital unpaid obligations of Nelson Happy resulted in the need for

37